UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

FEDERAL DEPOSIT INSURANCE CORPORATION,
in its capacity as Receiver for IndyMac Bank, FSB,

                      Plaintiff,

– against –

CHICAGO TITLE INSURANCE COMPANY, as
successor in interest to TICOR TITLE INSURANCE
COMPANY OF FLORIDA,

                      Defendant.

Case No.:

**COMPLAINT**

---

      Plaintiff, Federal Deposit Insurance Corporation, in its capacity as Receiver For IndyMac Bank, FSB ("Plaintiff"), by its undersigned attorneys, alleges against the defendant, Chicago Title Insurance Company ("Chicago Title" or "Defendant"), as successor to Ticor Title Insurance Company of Florida ("Ticor") as follows:

### Jurisdiction and Venue

      1.    This Court has original jurisdiction because a suit brought by the FDIC-R is deemed to arise under the laws of the United States under 28 U.S.C. § 1331 and 12 U.S.C. § 1819(b)(2)(A) (providing federal court jurisdiction for "all suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party")

      2.    Venue in this Court is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this judicial district and the property that is the collateral for the subject loan of this Action is situated within this judicial district.

## Parties

3. The Federal Deposit Insurance Corporation ("FDIC") is a corporation and instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a), and is authorized to be appointed as receiver for insured depository institutions that have failed. 12 U.S.C. § 1821(c).

4. IndyMac Bank, F.S.B. ("IndyMac") was a federally chartered insured depository institution with its principal place of business in Pasadena, California.

5. IndyMac was in the business of, among other things, buying and/or funding mortgage loans.

6. Financial Freedom Senior Funding Corporation ("Financial Freedom") was a wholly-owned subsidiary of IndyMac.

7. Financial Freedom was in the business of, among other things, funding reverse mortgages originated or purchased by IndyMac.

8. On July 11, 2008, the Office of Thrift Supervision appointed the FDIC as receiver for IndyMac.

9. On the same date, a new institution was chartered, IndyMac Federal Bank, FSB ("IndyMac Federal"), to which the FDIC as Receiver for IndyMac transferred certain assets, including Financial Freedom, pursuant to a Purchase and Assumption Agreement.

10. The FDIC was appointed as conservator of IndyMac Federal (the "FDIC-Conservator"), and was subsequently appointed as its receiver (also, "FDIC-R").

11. The FDIC-Conservator continued to operate IndyMac Federal Bank and its subsidiaries so as to maximize their value for future sale.

12. During the conservatorship, Financial Freedom continued to originate or purchase reverse mortgage loans originated by other lenders and sell them to investors, while retaining the servicing of the loans.

13. On March 19, 2009, non-party OneWest Bank ("OneWest") agreed to purchase from the FDIC-R substantially all of the assets of IndyMac Federal Bank, including the mortgage servicing rights owned by Financial Freedom.

14. At the time of OneWest's purchase, Financial Freedom owned a pipeline of reverse mortgage loans to be sold to various investors, including the Federal National Mortgage Association ("Fannie Mae").

15. Under the terms of its March 19, 2009 purchase from the FDIC-R, OneWest agreed to complete the origination of the reverse mortgage loans in Financial Freedom's pipeline and complete the sale of such mortgage loans to Fannie Mae.

16. The loan made purportedly to Irene Prusik (the "Loan"), referenced in paragraph 26 below, was among the Financial Freedom pipeline loans which were originated and sold to Fannie Mae.

17. As part of the March 19, 2009 transaction with the FDIC-R, OneWest assumed any liabilities or obligations imposed on the seller of loans to Fannie Mae, including the Loan, subject to the FDIC-R's indemnification of losses incurred by OneWest for claims made by Fannie Mae.

18. OneWest repurchased the Loan from Fannie Mae and requested that the FDIC-R repurchase the Loan from OneWest.

19. The FDIC-R repurchased the Loan from OneWest in October 2012.

20. Consequently, the FDIC-R succeeded to the rights to bring this litigation.

21. The FDIC-R is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819(a).

22. In this action, the FDIC-R seeks to recover damages resulting from the conduct of the Defendant.

23. Defendant Chicago Title is a Nebraska corporation authorized to conduct business in New York.

24. Chicago Title is a successor by merger to Ticor. At all relevant times, Ticor was engaged in the business of issuing title insurance policies and was doing business in New York.

## Factual Background

*Mortgage Fraud Scheme*

25. On or about April 16, 1987, Irene Prusik ("Prusik") took title to real property located at 492 6th Avenue in Brooklyn, New York 11215 (the "Property").

26. In or around April 2009, an individual purporting to be Prusik, who on information and belief was in fact Prusik's son Thomas Prusik-Parkin ("Prusik-Parkin"), obtained the Loan, a $938,250 adjustable rate home equity conversion (reverse mortgage) loan secured by a mortgage (the "Mortgage")[1] on the Property.

27. Metrocities Mortgage, LLC ("Metrocities") was a third-party broker/correspondent for IndyMac's subsidiary Financial Freedom. Metrocities was listed as the mortgagee under the Loan, which was table-funded by and subsequently assigned to Financial Freedom.

28. Unbeknownst to Financial Freedom, Prusik had in fact passed away in or around September 2003.

---

[1] Notwithstanding its invalidation, discussed *infra*, the Loan and associated mortgage are referred to as "the Loan" and the "Mortgage" in this Complaint, for ease of usage.

29. The Loan documentation related to the Mortgage was signed by Mhilton Rimolo ("Rimolo"), who purported to be the attorney-in-fact for Prusik.

30. Included in the Loan documentation was a "Reverse Mortgage Affidavit" dated April 3, 2009, on which Prusik's signature was forged.

31. An individual impersonating Prusik appeared at the closing of the Loan. On information and belief, this individual was Prusik-Parkin.

32. Prusik-Parkin and Rimolo were arrested and indicted in a 47-count indictment that included charges of grand larceny, forgery, perjury, conspiracy and criminal impersonation. Many of the counts in the indictment related to the origination of the Loan in Prusik's name.

33. In or about May 2012, Prusik-Parkin was convicted of several of the counts in the indictment, including, among other things, grand larceny and mortgage fraud.

*Invalidation of the Mortgage*

34. An action concerning the Property was brought against Metrocities in June 2009 in the Supreme Court of the State of New York, County of Kings ("New York Court"). Financial Freedom was subsequently joined as a defendant in the New York Court action.

35. The New York Court ultimately issued an order stating that the Mortgage was "void" and that its holder (Metrocities, and later Financial Freedom) was not a "bona fide encumbrancer."

*The Title Insurance Policy*

36. Ticor issued American Land Title Association Loan Policy No. NY7054-51-T009-302129-2009.7130732-77702610 (the "Policy") to Metrocities and its successors and/or assigns. The Policy provided title insurance with respect to the Mortgage and the Property.

37. Ticor was paid good and fair consideration for the insurance coverage provided by the Policy.

38. The Policy was assigned to Financial Freedom. As explained in Paragraphs 41-51 below, the FDIC-R now owns Financial Freedom's interests in the Policy.

39. The Policy states in pertinent part[2]:

**COVERED RISKS**

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, TICOR TITLE INSURANCE COMPANY OF FLORIDA, a Nebraska corporation (the "Company") insures as of Date of Policy and … against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of: …

    1.    **Title being vested other than as stated in Schedule A.**[3]

    2.    **Any defect in or lien or encumbrance on the Title.** This Covered Risk includes but is not limited to insurance against loss from
        (a)    A defect in Title caused by

            (i)    forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

            (ii)    failure of any person or Entity to have authorized a transfer or conveyance;

…

    9.    **The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title.** This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage

        (a)    forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

        (b)    failure of any person or Entity to have authorized a transfer or conveyance;

---

[2] Plaintiff reserves its rights to assert additional Policy provisions that were breached by Defendant as further facts and information are learned during the discovery process.

[3] Schedule A to the Policy states that as of the date of the Policy, a fee simple interest was vested in Irene Prusik.

 (c) the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

. . .

 (e) a document executed under a falsified, expired, or otherwise invalid power of attorney . . . (emphasis added)

*History of Claims*

40. The Loan was originated by Metrocities, a third-party broker/correspondent for Financial Freedom, but was funded by Financial Freedom. The Loan was assigned to Financial Freedom in 2009.

41. In April 2009, Financial Freedom sold the Loan to the Federal National Mortgage Association ("Fannie Mae") pursuant to a 2008 Master Agreement to sell and deliver residential mortgages to Fannie Mae.

42. Servicing of the Loan was transferred by Financial Freedom to Financial Freedom Acquisition, LLC ("FFA"), an affiliate of OneWest, which had acquired assets of IndyMac Bank from the FDIC-R.[4]

43. As part of OneWest's transaction with the FDIC-R, its affiliate FFA assumed any liabilities or obligations imposed on the seller of loans sold to Fannie Mae, including the Loan, subject to the FDIC-R's ultimate loan reimbursement obligations to FFA.

44. On information and belief, on multiple occasions commencing on or about May 12, 2009, FFA submitted title claim letters to Ticor.

45. On information and belief, thereafter, Ticor sent no less than seven requests to FFA for additional information.

---

[4] The Reverse Mortgage Business Asset Purchase Agreement entered into among FDIC-R, Financial Freedom, OneWest, and FFA required transfer of the servicing of "pipeline mortgages" (mortgages originated after the March 19, 2009 effective date of the agreement) to FFA/OneWest.

7

46. On information and belief, FFA responded to each of Ticor's requests for information.

47. In June 2011, FFA transferred the servicing of the Loan to OneWest, which assumed FFA's liabilities and obligations to Fannie Mae.

48. On or about July 12, 2012, OneWest as servicer of the Loan self-identified the Loan to Fannie Mae as fraudulent, and repurchased the Loan from Fannie Mae.

49. On or about August 27, 2012, OneWest requested that the FDIC-R repurchase the Loan due to a breach of warranty and representation.

50. In October 2012, the FDIC-R repurchased the Loan from OneWest.

51. Through these various assignments and repurchases, the FDIC-R presently holds the Loan and Metrocities' interests in the Policy.

52. Reverse Mortgage Solutions ("RMS") is the FDIC-R's servicer on a number of loans, including the Loan.

53. On or about June 29, 2015, RMS, as attorney-in-fact for the FDIC-R, yet again submitted a title claim letter to Chicago Title.

54. To date, Chicago Title has refused to compensate Plaintiff or its predecessors in interest for its losses and damages covered under the Policy

### Count I
### Breach of Contract

55. Plaintiff re-alleges and incorporates the foregoing paragraphs, as if fully set forth herein.

56. Ticor issued the Policy to Metrocities and its successors and/or assigns, including Plaintiff.

57. The Mortgage was insured by the Policy.

8

58. The Mortgage and Loan were obtained through a fraudulent identity theft scheme engaged in by Prusik-Parkin and Rimolo. Prusik-Parkin and Rimolo impersonated Prusik and her representative, respectively, and/or forged Prusik's signature.

59. Prusik was in fact deceased at the time the Policy was issued. As a result, title was not vested as stated in Schedule A of the Policy.

60. Extensive defects in title existed at the time the Policy was issued due to, *inter alia*, the forgery, fraud and impersonation committed by Prusik-Parkin and Rimolo.

61. The Mortgage was invalid, unenforceable, null and void as a result of Prusik-Parkin and Rimolo's forgery, fraud and impersonation; unauthorized transfer; improper creation, execution and acknowledgment of the Mortgage; and execution of documents under a falsified power of attorney.

62. FFA and RMS as attorney-in-fact for the FDIC-R timely demanded compensation from Ticor and/or Chicago Title for the losses and damages covered under the Policy.

63. Ticor and/or Chicago Title refused to compensate Plaintiff and its predecessors in interest for the losses and damages covered under the Policy.

64. Ticor and/or Chicago Title breached the Policy by wrongfully denying and/or failing to issue Policy benefits in response to the claims of Plaintiff and its predecessors in interest.

65. Plaintiff and its predecessors in interest were willing, able, and prepared to fully perform their obligations or conditions under the Policy

66. Plaintiff and its predecessors in interest fully performed under the Policy.

67. As a result of Defendant's breach, FDIC-R suffered losses and damages in a sum to be proven upon the trial of this matter.

**WHEREFORE,** the FDIC in its capacity as Receiver for IndyMac Federal Bank, FSB respectfully demands judgment as follows:

1. Damages in an amount to be determined at trial.

2. Any other relief that this Court deems just and proper, together with the costs, disbursements and attorney's fees incurred in this action.

Dated: New York, New York
February 8, 2016

>                    ELLENOFF GROSSMAN & SCHOLE LLP
>
> By:    /s Eric Weinstein
>        Eric Weinstein
>        Yong Hak Kim (Of Counsel)
>        1345 Avenue of the Americas
>        New York, New York 10017
>        Tel: (212) 370-1300
>        Fax: (212) 370-7889
>        eweinstein@egsllp.com
>
>        Counsel for Plaintiff